**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

|  |  |  |
|---|---|---|
| JAMES COURTNEY RAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:21-cv-04001-NKL |
| v. | ) | |
| | ) | |
| CANDACE PARK, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**ORDER**

Before the Court is a Motion for Summary Judgment filed by Defendants Rebecca Ehlers and Anne Precythe. *See* Doc. 100. At all relevant times, Ms. Ehlers was a warden at the Booneville Correctional Center ("BCC"), and Ms. Precythe was the director of the Missouri Department of Corrections. Plaintiff James Ray claims that Ms. Ehlers and Ms. Precythe violated his Eighth Amendment rights while he was an inmate at BCC. While incarcerated, Mr. Ray was sexually assaulted by a prison guard, Candace Park. While neither Ms. Ehlers nor Ms. Precythe was involved in the sexual assault, Mr. Ray claims that they were, in various ways, deliberately indifferent to the substantial risk of sexual assault at BCC and Mr. Ray's serious medical needs while incarcerated. Mr. Ray alleged that Ms. Ehlers and Ms. Precythe knew that Ms. Park had sexually assaulted inmates in the past, that sexual assault was common at BCC, and that BCC medical staff routinely provided poor medical care. Mr. Ray alleged that, even armed with that knowledge, neither official took any action.

However, after discovery, Mr. Ray has produced no evidence to support these allegations—or any evidence at all supporting an Eighth Amendment violation. The Court therefore **GRANTS**

1

summary judgment in favor of Ms. Precythe and Ms. Ehlers. At bottom, the evidence in this case is remarkably thin, and from that evidence, no reasonable jury could conclude that either Ms. Ehlers or Ms. Precythe was deliberately indifferent to a serious risk of harm or a serious medical need.[1]

## I.     Background[2]

Plaintiff James Ray was an inmate at BCC beginning in January 2019. Mr. Ray was housed in the honor wing, which is reserved for offenders who show good behavior while in prison. As a result, the honor wing housing unit was separated from the rest of the prison and had a more "laid back" reputation. Doc. 101-3, at 29:6–23.[3]

### A.  Ms. Park's Interactions with Mr. Ray

Candace Park was hired on September 16, 2019, as a floating night shift prison guard. This meant that Ms. Park would rotate through BCC's seven housing units, including the honor wing. Doc. 103-9, at 1; Doc. 101-4, at 20:3–11. Ms. Park's shift began at 11:30 p.m. and concluded at

---

[1] Mr. Ray's claims against Ms. Park—who did not move for summary judgment—remain pending.

[2] At summary judgment, the Court interprets the facts in the light most favorable to Mr. Ray. However, interpreting the facts "'in the light most favorable' to [nonmovant plaintiff] does not necessarily mean the facts 'as stated by' [plaintiff] in her brief on appeal, as there are multiple facts stated in the brief that are not supported by record evidence or are contradicted by the record evidence." *Marsh v. Phelps Cnty.*, 902 F.3d 745, 748 n.3 (8th Cir. 2018). While the Court interprets the facts in Mr. Ray's favor, where Mr. Ray argues facts that are unsupported, or worse, contradicted, by the record, the Court cannot blindly accept his facts. The same is true when Mr. Ray fails to controvert material facts as required by Fed. R. Civ. P. 56.

[3] Mr. Ray relies on many facts in his brief that are not included in his Statement of Additional Material Facts. *See* Doc. 102, at ECF 9–13; Doc. 103. Local rule requires that Mr. Ray separately list any facts on which he relies that are not contained in the movant's Statement of Material Facts. Local Rule 56.1(b)(2). Yet, many times, he did not. The Court has broad discretion to fashion a remedy. Fed. R. Civ. P. 56(e); *see also* Local Rule 56.1(b)(1). Because Defendants did not raise the issue, and given the sparsity of the evidence, the Court will look to the record to resolve the summary judgment motion.

7:30 a.m.  Doc. 101-4, at 20:16–18.  Only one prison guard worked each housing unit at a time.  *See* Doc. 101-4, at 26:15–19.  A lieutenant, stationed in the prison's control center to supervise the entire prison, also worked every shift.  The lieutenant was responsible for assigning prison guards to the different housing units each shift.  Prison guards typically worked an entire shift in the same housing unit.  Various sergeants also were assigned to each shift at BCC.  Each sergeant was responsible for several housing units, acting as a supervisor to the prison guards stationed in those units.  *See* Doc. 101-4, at 25:15–26:14

Mr. Ray and Ms. Park initially had a good relationship.  Mr. Ray worked with a BCC program that brought shelter dogs to the prison, and as a result Mr. Ray often had a dog kennel near his cell.  Ms. Park, indeed, many BCC staff members, often stopped by Mr. Ray's cell to pet the dog.  Mr. Ray and Ms. Park frequently discussed the program, the dogs with which Mr. Ray worked, and Ms. Park's interest in adopting or fostering a dog.  *See* Doc. 101-3, at 37:8–13.  Mr. Ray liked talking with Ms. Park, and she never made him uncomfortable.  Doc. 101-3, at 43:12–44:17.  To Mr. Ray, Ms. Park acted like a typical corrections officer.  *Id.*

However, in February 2020, Ms. Park began to flirt with Mr. Ray.  In February 2020, Ms. Park told Mr. Ray he was "cute" while she was in his wing visiting the dogs.  Doc. 101-3, at 41:15–19.  Although it was not abnormal for the corrections officers to walk Mr. Ray's wing and play with the dogs (Doc. 101-3, at 43:12–44:1), this was the first time that Ms. Park (or any BCC staff member) acted unprofessionally with Mr. Ray while doing so.  Doc. 101-3, at 39:10–40:3; 42:15–16.  This was the first time that Mr. Ray felt that Ms. Park crossed a line.  It was also the first time that Mr. Ray saw any indication that Ms. Park did not understand the boundary between inmate and corrections officer.  Doc. 101-3, at 45:16–21.  There is no evidence that Mr. Ray reported Ms. Park's behavior at that time.

3

A few weeks later, Ms. Park sexually assaulted Mr. Ray twice while working the night shift. On February 16, 2020, Ms. Park was doing a routine walk-through in Mr. Ray's housing wing. When she reached Mr. Ray's cell, she entered and performed oral sex on Mr. Ray. Mr. Ray tried to push Ms. Park off him and warned her that his cellmate—whom Ms. Park believed had left the prison—was still in the cell sleeping. Doc. 101-3, at 46:5–47:6. Ms. Park became agitated, mentioned that she could go to jail, and told Mr. Ray that if he told anyone, she would tell BCC that she came to play with the dog outside Mr. Ray's cell, and Mr. Ray took advantage of her. *Id.*[4] Ms. Park also warned that reporting her would impede Mr. Ray's ability to see his son and ruin his chances for parole. Doc. 101-3, at 49:3–15.

Later that same shift, in the early morning of February 17, 2020, Ms. Park returned to Mr. Ray's cell and forced him to meet her in the staff bathroom. Ms. Park told Mr. Ray, "I was on camera doing something wrong. You're going to be on camera. I fucked up . . . I fucked up." Doc. 101-3, at 52:18–23. When Mr. Ray entered the staff bathroom, Ms. Park forced Mr. Ray to have vaginal intercourse with her.

Mr. Ray saw Ms. Park only several times after the rape, but she never worked in Mr. Ray's housing unit again after the rape. Doc. 101-3, at 60:6–15. After March 10, 2020, Mr. Ray never saw Ms. Park again. *Id*.

As a result of the rape, Ms. Park had a child. A paternity test, ordered by this Court, concluded that Mr. Ray is the father of Ms. Park's child.

---

[4] Mr. Ray's cellmate, Kenneth Light, woke up while Ms. Park was in Mr. Ray's cell; he allegedly saw her performing oral sex. Doc. 101-3, at 46:5–47:22. He told another inmate about what he witnessed. There is no evidence—either by deposition or affidavit—from Mr. Light or Chad Scott, the inmate to whom Mr. Light spoke, in the record.

4

**B. Mr. Ray Reports Ms. Park**

Mr. Ray did not report his rape until approximately six months later, in September 2020, at which time Ms. Park no longer worked at BCC.[5]  Mr. Ray waited because he believed that he would lose privileges if he reported the rape, up to and including being placed in isolation, and that reporting could negatively affect his chance at parole.  Doc. 104, at ECF 9–10.  Nevertheless, in late September 2020, a corrections officer named Sergeant Berry stopped Mr. Ray while he was walking outside BCC and asked him if he slept with Ms. Park.  Doc. 101-3, at 68:9–69:8.  Mr. Ray said yes, though he did not at that time indicate he had been assaulted.  To Mr. Ray's knowledge, Sergeant Berry never told anyone else; he simply told Mr. Ray that he needed to get tested for STIs because Ms. Park had slept with many inmates.

Not long after, on approximately September 28, 2020, Mr. Ray disclosed the sexual assault to Hayley Joyce, BCC's grievance officer, and Ashely Coffelt, BCC's Prison Rape Elimination Act ("PREA") coordinator.  Doc. 103-6; Doc. 101-3, at 74:25–75:2 (identifying Ms. Coffelt as the PREA coordinator); 107:21–108:5 (discussing Mr. Ray's interactions with Ms. Joyce and Ms. Coffelt and identifying Ms. Joyce as the grievance officer).  Mr. Ray spoke with Rick Skaggs, a warden at BCC responsible for PREA compliance, shortly after he reported the rape in September 2020.  Doc. 101-3, at 113:4–14.  Mr. Ray was brought to the office of Hayley Joyce, BCC's

---

[5] In his Statement of Additional Material Facts, Mr. Ray states that Ms. Park's sexual assault on Mr. Ray was a rumor throughout the prison staff and inmates, and that despite that knowledge, BCC staff "did nothing to assist James Ray until months after the rape occurred."  Doc. 104, at ECF 8.  These statements mischaracterize the evidence.  *After* Mr. Ray reported Ms. Park, rumors spread throughout the prison, not before.  As soon as Mr. Ray reported the rape, as discussed further below, he was interviewed, and he gave a formal report to BCC staff, and Ms. Ehlers subsequently requested a formal investigation into Ms. Park.

5

grievance officer, and gave a report to Ms. Joyce, Ms. Coffelt, and Lieutenant Womack. Doc. 101-3, at 114:3–11. Mr. Ray filed a formal PREA report. Doc. 103-6.

A few days later, on October 1, 2020, Rebecca Ehlers, BCC's warden, submitted a request for investigation in response to Mr. Ray's report.[6] Doc. 101 at ¶ 30. As warden, Ms. Ehlers generally oversees all prison operations and staff. That said, Mr. Ray's report was the first time that Ms. Ehlers learned of any sexual contact between Ms. Park and Mr. Ray. *Id.* at ¶ 31. Indeed, Ms. Ehlers did not know about any other sexual encounter between corrections officers and inmates at BCC that had occurred prior to Mr. Ray's rape. *Id*. at ¶ 32.

At all relevant times, Anne Precythe was the Director of the Missouri Department of Corrections. Ms. Precythe knew nothing about Mr. Ray's rape, nor did Ms. Precythe know of any sexual encounters between inmates and staff at BCC, including encounters involving Ms. Park. Mr. Ray had never seen, met, or spoken to Ms. Precythe. Ms. Precythe is not directly involved with Missouri Department of Corrections personnel matters; instead, she relies on staff who have the authority to handle the day-to-day operations of the various prisons. Doc. 101-2, at ¶¶ 8–9. There is no evidence that Ms. Precythe ever visited BCC while Mr. Ray was an inmate there.

Mr. Ray does not suggest that BCC's supervision of corrections officers was deficient. Doc. 101-3, at 19:5–7 (Q: "Do you think there were situations where [corrections officers] were not properly supervised? A: No."). However, he argues that BCC's training was inadequate.

Ms. Park received formal academy training and had to complete additional training before starting at BCC. Her training included a class—which she had to pass—addressing the Prison Rape Elimination Act. Doc. 101-4, at 49:4–13. Ms. Park knew that corrections officers "cannot

---

[6] No report or other documentation resulting from this investigation appears in the record.

have consensual relationships with staff and inmates." *Id.* at 49:17–50:6. She specifically knew from her training that voluntary sexual interactions with Mr. Ray would violate PREA and be inappropriate. *Id.* at 50:17–20. Ms. Park did not know if BCC had its own written policy mandating "zero tolerance" of sexual contact between staff and inmates. *Id.* at 51:8–17. She also did not recall whether BCC had a PREA coordinator. *Id.* at 51:18–52:1.

### C. Ms. Park's Allegation of Sexual Assault

After Mr. Ray's rape but before Mr. Ray reported it, Ms. Ehlers did learn of another sexual encounter involving Ms. Park. On April 1, 2020, Ms. Park reported that an inmate sexually assaulted her in a staff bathroom at BCC. The next day, Ms. Ehlers completed a request for investigation into Ms. Park's behavior with inmates. *See* Doc. 102, at ¶¶ 34–35.[7] Ms. Park was not currently working at BCC; she stopped showing up to work after the report, and she was terminated effective May 18, 2020, for "job abandonment." Doc. 103-9, at 1.

An investigator spoke with numerous witnesses and reviewed video footage to determine whether Ms. Park had inappropriate contact with two inmates at BCC. Investigators identified two potential issues. First, Ms. Park was seen entering a staff bathroom alone with inmate Justin Lollar on April 1, 2020. Ms. Park and Mr. Lollar were alone in the bathroom for approximately a minute and twenty seconds, and the door never closed fully. Doc. 103-9, at 2; *see also id.* at 8. Another officer saw Ms. Park as she was leaving the bathroom. When Ms. Park realized this, she became upset and reported that she had been raped. *Id.*; *see also id.* at 5. Neither Ms. Park nor Mr. Lollar

---

[7] Mr. Ray responds to this, and many other, facts asserted by the Defendants by stating that he is "without sufficient knowledge to admit or deny." Such a response is a legal nullity. To properly dispute a fact, Mr. Ray must "cite[] to particular parts of materials in the record." *See* Fed. R. Civ. P. 56(1)(A). Mr. Ray's failure to properly dispute, indeed his failure to address at all, certain facts offered by the Defendants, compels the Court to deem such facts undisputed for the purposes of this Motion. *See* Fed. R. Civ. P. 56(e)(2).

appeared upset or "distorted" when they left the bathroom; it was only after Ms. Park saw a fellow corrections officer that she became upset. *Id.* at 8. Mr. Lollar denied ever having any sexual contact with Ms. Park and indicated Ms. Park told him to clean the staff bathroom before returning to his bunk for the night. Mr. Lollar did later tell the investigator that Ms. Park may have tried to kiss him as he left the bathroom, but he left in a hurry, so he could not be sure. The inmate suggested the investigator keep looking into Ms. Park's behavior because several inmates had bragged about having a sexual relationship with Ms. Park. *Id.* at 4.

Second, the day before, Ms. Park was alone with another inmate, Keith Scott, in another housing unit. Ms. Park unlocked the laundry room doors at 10:57 p.m. and entered with Mr. Scott. A minute later, an unknown inmate looked in the laundry room window. Mr. Scott left the laundry room and walked with the unknown inmate back to the housing unit's "dayroom." Mr. Scott returned to the laundry room immediately, but by 10:59 p.m., another unknown inmate approached the laundry room. Ms. Park and Mr. Scott then left the laundry room. The entire interaction lasted less than three minutes. *Id.* at 2. Other inmates reported a rumor about a "physical encounter" between Mr. Scott and a female corrections officer, and one inmate reported that Mr. Scott bragged about a sexual encounter, but Mr. Scott never identified Ms. Park by name. *Id.* at 3. When interviewed, Mr. Scott denied any sexual contact and said that he approached Ms. Park to request her to unlock the laundry so Mr. Scott could complete part of his prison-assigned work. *Id.* at 5.

The investigation found no evidence of sexual encounters between Ms. Park and an inmate, though it did conclude that Ms. Park violated BCC policy by being alone with and having unauthorized interactions with inmates. *See generally id.*; 8–9.

8

### D. Rumors About Ms. Park

Mr. Ray spoke often with several BCC staff members. These included Hayley Joyce, BCC's grievance officer, and Ashley Coffelt, the PREA coordinator. Mr. Ray indicated that both Ms. Joyce and Ms. Coffelt knew Ms. Park had sexual encounters with BCC inmates. However, when Mr. Ray reported the rape to them in September 2020, neither had any idea that Ms. Park had raped Mr. Ray. Doc. 101-3, at 62:22–63:7.

In September 2020 and after Mr. Ray reported Ms. Park, several BCC staff members—Ms. Joyce, Ms. Coffelt, Sergeant Berry, and Sergeant Spencer—all told Mr. Ray that Ms. Park had had sexual encounters with other inmates. *See* Doc. 104, at ECF 7.[8] However, Mr. Ray had never heard rumors about Ms. Park having sex with other inmates before his sexual assault. Doc. 101-3, at 27:15–28:2; 30:2–10. Even after his assault, Mr. Ray had never heard of Ms. Park forcing anyone else to have sexual contact; as far as he knew, both of Ms. Park's other sexual encounters about which Mr. Ray knew had been consensual. Doc. 101-3, at 34:6–12. From BCC staff, Mr. Ray learned that those encounters involved Mr. Scott and Mr. Lollar. *Id.* at 34:13–18. The only person to mention Ms. Park's having sex with inmates to Mr. Ray prior to his reporting Ms. Park was Sergeant Berry, who spoke with Mr. Ray shortly before he reported the rape.

---

[8] Mr. Ray states that "the staff at BCC were well-aware about instances of misconduct between corrections officers and inmates." Doc. 102, at ECF 10 ¶ 4. But the evidence he cites cannot be read so broadly. Several BCC staff members knew that Ms. Park had allegedly slept with other inmates when Mr. Ray told them in September 2020 that Ms. Park assaulted him several months prior. Doc. 104, at ECF 7. Nothing in the record supports that there were any incidents involving other officers, nor is there any evidence that Ms. Park's encounters with other inmates—beyond Mr. Ray—were anything other than rumors among inmates and staff.

### E. Mr. Ray's Other Complaint About Ms. Park

Prior to the rape, Mr. Ray had reported one issue with Ms. Park. Before Mr. Ray became close with Ms. Park, Mr. Ray reported that she had grabbed him when she was in the process of counting off the inmates in Mr. Ray's cell block outside their cells. While Ms. Park was counting, the power at BCC went out. Ms. Park was standing by Mr. Ray at the time, and, in the dark, she grabbed him, saying, "don't let nothing happen to me." Doc. 101-3, at 37:11–38:5. Ms. Park's actions did not make Mr. Ray uncomfortable, nor did he think that Ms. Park was "trying to do something." Doc. 101-3, at 39:10–40:3. Mr. Ray reported the incident to Hayley Joyce, BCC's grievance officer, and Ashley Coffelt, the PREA coordinator. He explained that while it was "odd," he understood that she was scared, being the only officer in a dark room with inmates out of their cells. This incident also occurred shortly after inmates in another housing block attacked other corrections officers at BCC, which Mr. Ray believed had put all BCC staff on edge. Doc. 101-3, at 38:10–40:3. Nevertheless, Mr. Ray reported the incident because a corrections officer grabbing an inmate was not normal or common; "they just don't do that." Doc. 101-3, at 39:10–40:3.

### F. Medical Complaints

While Mr. Ray was incarcerated at BCC, he experienced migraines and gastrointestinal issues that caused him pain. He saw various medical professionals at BCC to address them. Doc. 102, at ¶ 43. Mr. Ray was also referred to outside medical providers to address his medical complaints. *Id.* at ¶ 44. Medical professionals consistently provided Mr. Ray with treatment, but nothing helped. While he was treated by BCC medical staff, Mr. Ray was at times degraded; medical professionals several times made disparaging comments about his weight. *See generally* Doc. 103-7.

Mr. Ray claims BCC medical staff harassed him *after* Ms. Park's sexual assault. *See* Doc. 104, at ECF 8. The evidence he cites does not support this. At most, Mr. Ray claimed his medical treatment was "terrible," and BCC refused to test him for all medically appropriate STIs. After Ms. Park raped Mr. Ray, Mr. Ray requested testing and treatment for sexually transmitted infections. PREA mandates that following a sexual assault in prison, victims receive any medically appropriate STI test. Doc. 104, at ECF 7. BCC refused to test Mr. Ray for syphilis and Human Immunodeficiency Virus. Mr. Ray ultimately tested negative for all STIs, including both syphilis and HIV, after he left the prison.

Neither Ms. Ehlers nor Ms. Precythe was personally involved with Mr. Ray's medical care, nor did they have any reason to have any information about Ms. Ray's medical treatment. Doc. 102, at ¶¶ 45–47, 49–51. There is no evidence that Ms. Ehlers and Ms. Precythe participated in or were involved in the medical care of any inmate; they testified to relying on others to provide and facilitate medical treatment. Neither official knew (or knows) of anything that would suggest that BCC's medical providers were generally inadequate. *See* Doc. 102, at ¶¶ 46–51.[9]

## II.    Standard

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Higgins v. Union Pac. R.R.*, 931 F.3d 664, 669 (8th. Cir. 2019) (quotation marks and citation omitted); Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.

---

[9] Mr. Ray responds to several of these facts with "without sufficient knowledge to admit or deny." The Court considers those facts admitted. *See supra* n.7.

*Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

A party cannot defeat summary judgment by merely relying upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). While the moving party bears the burden of establishing a lack of any genuine issues of material fact, *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010), the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue of material fact for trial." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   Discussion

"To state a claim under § 1983, a plaintiff must allege (1) that the defendant acted under color of state law, and (2) that the alleged conduct deprived the plaintiff of a constitutionally protected federal right." *Van Zee v. Hanson*, 630 F.3d 1126, 1128 (8th Cir. 2011). Mr. Ray argues that his treatment by BCC officials violated the Eighth Amendment's prohibition against cruel and unusual punishment. "'[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). Accordingly, prison officials must take reasonable measures to ensure the safety of inmates. *Farmer*, 511 U.S. at 832–33.

The sexual assault of an inmate by a guard violates the inmate's Eighth Amendment rights. *See e.g.*, *Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998) ("Certainly, sexual or other assaults [by prison employees] are not a legitimate part of a prisoner's punishment, and the substantial physical and emotional harm suffered by a victim of such abuse are compensable injuries."). Because this Motion for Summary Judgment addresses Mr. Ray's claims against Warden Rebecca Ehlers and Director Anne Precythe, not Ms. Park, the Eighth Amendment analysis must continue. This is "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, [so] a plaintiff must plead [and, at the summary judgment stage, have proof] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Ambrose v. Young*, 474 F.3d 1070, 1079 (8th Cir. 2007). A prison official may be held liable to an inmate if he directly participated in the violation of her constitutional rights or if his failure to protect the inmate caused the violation. *See Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806–07 (8th Cir. 1994); *Jensen v. Clarke*, 94 F.3d 1191, 1197 (8th Cir. 1996).

Mr. Ray does not argue that Ms. Precythe and Ms. Ehlers sexually assaulted him. Instead, Mr. Ray's claim rests on three related constitutional violations that he argues are directly traceable to Ms. Precythe and Ms. Ehlers: (1) the decision to not surveil physical areas where they knew sexual violence was routinely taking place; (2) the decision to expose prisoners to prison guards known to have a history of sexual violence; and (3) the custom of intentionally turning a blind eye to known inadequate healthcare to prisoners. However, there is no evidence to support any of Mr. Ray's § 1983 claims.

### A. Whether Ms. Precythe and Ms. Ehlers Failed to Protect Mr. Ray

Mr. Ray's first two theories ultimately collapse into an argument that Ms. Precythe and Ms. Ehlers failed to protect him from Ms. Park. To prevail on a claim of failure to protect, prisoners must demonstrate (1) that they are incarcerated under conditions posing a substantial risk of serious harm and (2) that the prison officials subjectively knew of and disregarded that safety risk. *Farmer*, 511 U.S. at 834–35; *see also Jensen*, 94 F.3d at 1197.

The first requirement is objective, meaning the record must demonstrate both that the harm contemplated was serious and that there was a substantial risk the harm could occur. *Farmer*, 511 U.S. at 834. There is no dispute that sexual assault is a serious harm. *Kahle v. Leonard*, 477 F.3d 544, 550–51 (8th Cir. 2007). But to hold Ms. Ehlers and Ms. Precythe liable under the first element, Mr. Ray must prove that, because of the conditions about which he complains, there was objectively a substantial risk that he would be sexually assaulted by a prison guard. *Id.*; *see also Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 924 (8th Cir. 2010) (finding that prison transport procedure that permitted prisoners to be transported with inadequate restraints in a compartment that was inaccessible by, and outside the line of sight of, guards during transport, resulting in almost a total lack of supervision during transport likely satisfied objective risk element of Eighth Amendment).

Second, prison officials must have exhibited a sufficiently culpable state of mind; that is, Ms. Ehlers and Ms. Precythe must have been deliberately indifferent to a substantial risk of serious harm to Mr. Ray. *See Farmer*, 511 U.S. at 834. A prison official is deliberately indifferent when she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm

14

exists, and [s]he must also draw the inference." *Id.* at 837.[10] Mr. Ray need not prove that Ms. Ehlers and Ms. Precythe knew he would be sexually assaulted or that he himself was at risk from Ms. Park, but he still must prove that there was a substantial risk of sexual assault that they knowingly disregarded. *Walton v. Dawson*, 752 F.3d 1109, 1119 (8th Cir. 2014) (stating defendants "only needed to know (1) the jail cells were not being locked at night, and (2) leaving the cells unlocked overnight was 'an obvious, substantial risk to inmate safety'" for supervisor liability to attach); *Hott v. Hennepin Cnty.*, 260 F.3d 901, 906 (8th Cir. 2001) ("[F]or the purposes of failure to protect claims, it does not matter ... whether a prisoner faces an excessive risk of attack for reasons personal to [her] or because all prisoners in [her] situation face such a risk." (internal quotations omitted)).

Mr. Ray failed to produce evidence demonstrating that there was an objectively substantial risk that BCC inmates would be sexually assaulted by prison guards. And, even assuming there were, there is no evidence in the record from which a reasonable jury could conclude that either Ms. Ehlers or Ms. Precythe knew of or was deliberately indifferent to that risk. Some of Mr. Ray's complaints relate to BCC deficiencies and practices that he claims permitted Ms. Park to sexually assault him. Others relate to BCC's investigation of and response to the sexual assault. The Court will address each separately.

---

[10] Whether Defendants had knowledge of a substantial risk is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842. Nevertheless, "[a] single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisor liability." *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989). "However, as the number of incidents grow[s], and a pattern begins to emerge, a finding of tacit authorization or reckless disregard becomes more plausible." *Id.*; *see also Lenz v. Wade*, 490 F.3d 991, 995–96 (8th Cir. 2007).

15

1. **Pre-Sexual Assault Complaints**

   (a) **BCC's Training Program**

First, Mr. Ray takes aim at BCC's training; he argues that because Ms. Park did not receive additional training on PREA and sexual relations with inmates, Ms. Ehlers and Ms. Precythe failed to adequately train her, thereby creating a substantial risk of sexual assault by prison guards. Doc. 103, at 7.[11] A supervising officer may be held liable if her failure to train the offending officer caused a constitutional violation. *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir.1997). As an initial matter, the Eighth Circuit has expressly foreclosed Mr. Ray's failure to train argument: "there is no patently obvious need to train an officer not to sexually assault detainees in light of the regular law enforcement duties of officers and the fact that '[a]n objectively reasonable officer would know that it is impermissible' to engage in such behavior." *Marsh v. Phelps Cnty.*, 902 F.3d 745, 753 (8th Cir. 2018) (quoting *Parrish v. Ball*, 594 F.3d 993, 999 (8th Cir. 2010)).

Setting this aside, Mr. Ray is wrong on the facts. Mr. Ray faults Ms. Ehlers and Ms. Precythe[12] because while Ms. Park received sexual abuse and harassment training as part of her six-week training program at the academy, she did not receive follow-up training when she arrived at BCC. According to Mr. Ray, Ms. Park also did not receive any training on how to avoid

---

[11] It is unclear whether Mr. Ray argues that Ms. Ehlers and Ms. Precythe were deliberately indifferent because they kept Ms. Park on staff, despite knowing she sexually assaults inmates. For the avoidance of doubt, this argument necessarily fails on the evidence in the record. There is no evidence that Ms. Ehlers or Ms. Precythe knew that Ms. Park had sexually assaulted any inmate prior to Mr. Ray (or that Ms. Park had sexually assaulted any inmate prior to Mr. Ray at all). Because of that, there is simply no evidence to conclude that either official knew of a risk to Mr. Ray and disregarded it.

[12] The Court assumes for the purposes of this Motion, though there is no evidence to establish, that Ms. Ehlers as warden and Ms. Precythe as the director of the Missouri Department of Corrections had the authority to require (and implement) training programs at the beginning of each corrections officer's employment at an individual prison.

16

inappropriate relationships with inmates. Even accepting that to be true, Ms. Park knew from her training that sexual relationships between prison guards and inmates violated federal law. Doc. 101-4, at 50:1–20. Accordingly, a reasonable jury could not find that any inadequate training caused Mr. Ray's constitutional violation, because, at bottom, she knew that her conduct was illegal. *C.f.*, *Walton*, 752 F.3d at 1119–20 (sending failure-to-train claim against jail administrator to trial because officers' repeated practice of leaving detainees in unlocked cells was an objectively obvious risk to detainee safety about which officers should have been better trained).[13]

### (b) BCC's Surveillance

Next, Mr. Ray argues that there was a substantial risk of sexual assault stemming from BCC's decision to not have video surveillance outside the staff bathroom, "despite knowledge of crime routinely taking place there." Doc. 103, at 11. This argument, in several respects, misstates the evidence.

First, none of the evidence cited (and none that the Court could find) establishes that cameras did not cover the area outside of the staff bathroom. True, Ms. Park, sitting for a deposition approximately two years after she last worked at BCC, testified to not knowing if there were cameras covering the staff bathroom. Doc. 101-4, at 30:19–21. But that does not mean that there *were* no cameras, especially when all the evidence in the record suggests that there were. Mr. Ray himself states that when Ms. Park came to his cell to take him to the staff bathroom she said, "I was on camera doing something wrong [entering Mr. Ray's cell the first time]. You're

---

[13] Even if Mr. Ray had produced evidence demonstrating that there was objectively a substantial risk of sexual assault stemming from BCC's training policies, Mr. Ray has introduced no evidence that Ms. Ehlers and Ms. Precythe were deliberately indifferent to that risk. There is no evidence from which a reasonable jury could even infer that either official knew, or could have known, that the prison guard training program created a risk of sexual assault, let alone evidence that the officials deliberately disregarded that risk.

going to be on camera." Doc. 101-3, at 52:20–23. This suggests that there were cameras in the housing unit, including cameras covering the entrance of the staff bathroom. Further, investigators relied on video footage from the area outside of the staff bathroom when they investigated Ms. Park in April 2020 for her contact with other inmates.[14] *See generally* Doc. 103-9 (discussing the video footage showing Ms. Park's contacts with inmates in their housing units, including outside the staff bathroom). At bottom, there is no evidence supporting a conclusion that there was objectively a substantial risk of sexual assault stemming from BCC's lack of cameras because there is no evidence from which a reasonable jury could conclude that there *were* no cameras outside the bathroom.[15]

Second, even if the Court were to assume that there were no cameras, there is no evidence that Ms. Ehlers and Ms. Precythe knew "that crime routinely [took] place" inside the staff bathroom before Mr. Ray was raped, and therefore disregarded the risk to inmate safety posed by the lack of surveillance. To support his position that crime routinely took place in and around the staff bathroom, Mr. Ray cites the two incidents in March and April 2020 for which Ms. Park was investigated for inappropriate contacts with inmates. It is true that one of those two incidents involved Ms. Park and an inmate in the staff bathroom of the inmate's housing unit.[16] But even if

---

[14] It seems these inmates were housed in different units, but, even viewing the evidence in the light most favorable to Mr. Ray, there is no suggestion that the camera coverage was different in different housing units.

[15] For the avoidance of doubt, to the extent that Mr. Ray argues that BCC should have surveilled *inside* the staff bathroom, no reasonable jury could conclude on this record that failing to do so presented a substantial risk of harm.

[16] Cameras captured Ms. Park and the inmate entering and leaving the staff bathroom after a minute and twenty seconds, and the bathroom door was never fully shut. Investigators concluded that Ms. Park violated BCC policy by spending unnecessary time with inmates, within full view of BCC's cameras.

these instances could have put Ms. Ehlers and Ms. Precythe on notice of a dangerous condition in the prison, these encounters occurred—and Ms. Ehlers and Ms. Precythe learned of them—after Ms. Park raped Mr. Ray. These events therefore cannot establish that Ms. Precythe and Ms. Ehlers disregarded a known risk of sexual assault in the staff bathroom by failing to place cameras that *caused* Mr. Ray's assault.

### (c) Policy That Permitted Ms. Park to take Mr. Ray to the Staff Bathroom Alone

Mr. Ray argues that a BCC policy allowed Ms. Park to take Mr. Ray to the staff bathroom alone. There is no evidence that a BCC policy permitted Ms. Park to take Mr. Ray to the staff bathroom for maintenance in the middle of the night, let alone for her to join him inside. Mr. Ray also produced no evidence that Ms. Ehlers and Ms. Precythe knew of any risk of sexual assault stemming from such a policy. There is no evidence of any prior sexual assaults occurring because a prison guard could unilaterally take a prisoner out of his cell. Nor is the risk so open and obvious that a reasonable jury could conclude that prison officials knew of it. Ms. Park was supervised by a sergeant and a lieutenant the night of Mr. Ray's sexual assaults, and the record demonstrates that cameras covered the housing unit, including the area outside the staff bathroom. What's more, other inmates were in the housing unit at the time, including Mr. Ray's cell mate. Taken together, these facts do not suggest an open and obvious risk of sexual assault, especially when there is no evidence of prior incidents. *See e.g.*, *B v. Duff*, No. 06-cv-4912, 2009 WL 2147936, at *14 (N.D. Ill. July 17, 2009) ("The mere fact that sex between inmates and staff is a recognized problem among professionals, in general, at penal institutions, coupled with [prison official's] knowledge of unsubstantiated rumors concerning one inmate and [guard] . . . is insufficient to permit a trier of fact to infer knowledge of a substantial risk because it consists of vague information, and it does not demonstrate an ongoing pattern, or real, *actual* risk of sexual assault by the staff members at

19

Warrenville.").  At bottom, while sexual assault *could* be possible under such a policy, there is no evidence that it was such an open and obvious risk that Ms. Ehlers and Mr. Precythe were deliberately indifferent for not addressing it.  *C.f. Walton*, 752 F.3d at 1119.

And, to the extent Mr. Ray argues that BCC's staffing policy, which allowed an opposite-sex prison guard to be the only staff member physically present in the housing unit, was insufficient to protect him from the risk that a prison guard would take him to the staff bathroom or access his cell (even if doing so violated prison policy), this argument too must fail.  Even assuming such a policy created a substantial risk of harm—a conclusion the record does not support—there is certainly no evidence that Ms. Ehlers and Ms. Precythe knew of that risk.  *Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.").  For example, there is no evidence that assigning one prison guard to a housing unit had permitted sexual assault before, or that BCC had ever confronted issues stemming from its staffing policies.  Neither is the danger from such a policy open and obvious.  Ms. Park was largely on camera, and supervised by both a sergeant and lieutenant, both of whom were on shift with her.  Regardless of whether Mr. Ray's rape may now suggest that BCC's policies are deficient, there is certainly no evidence that they were obviously deficient prior to the rape.  As there is no evidence demonstrating that Ms. Ehlers as warden and Ms. Precythe as director knew that the staffing policy created a risk to inmate safety, Mr. Ray cannot establish deliberate indifference.

2.  **Post-Report Complaints**

Mr. Ray raises various complaints about events at BCC after his rape.  For example, he argues that Ms. Ehlers and Ms. Precythe failed to ensure PREA procedures were in effect and being followed, which made it difficult for Mr. Ray to report his sexual assault and protect himself

20

from harassment after reporting.[17]  Mr. Ray's letter to the PREA warden, in which he requested

the prison's PREA policy, was taken out of the mailbox and instead given to another BCC staff

member.  Mr. Ray also was not transferred to a different prison after the assaults.  Furthermore,

after Mr. Ray reported the rape, it was not kept confidential, and various BCC staff members made

comments to him about the rape.

Because Mr. Ray does not, and cannot, argue that these actions led to prison conditions

that facilitated his sexual assault, he must establish that the risks posed by these conditions were

objectively serious or caused an objectively serious injury to the plaintiff.  *Berryhill*, 137 F.3d at

1076.

To pose a "substantial risk of serious harm," an action or omission must "result in the denial

of the minimal civilized measure of life's necessities."  *Farmer*, 511 U.S. at 834 (internal

quotations omitted).  The conduct "must involve more than ordinary lack of due care for the

prisoner's interests or safety."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  "After incarceration,

only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment

forbidden by the Eighth Amendment."  *Id.*

Mr. Ray's complaints about post-report conduct, even when considered cumulatively, do

not rise to the level of an Eighth Amendment violation because Mr. Ray has failed to identify how

---

[17] Mr. Ray frames most of his complaints as simple violations of PREA.  *See* Doc. 103, at 7–8. PREA does not itself provide a private right of action.  *Johnson v. Garrison*, 859 F. App'x 863 (10th Cir. 2021); *Williams v. Wetzel*, 827 F. App'x 158, 162 (3d Cir. 2020); *Krieg v. Steele*, 599 F. App'x 231, 232 (5th Cir. 2015).  While courts can analyze alleged PREA violations through the lens of the Eighth Amendment, a violation of PREA does not constitute a *per se* Eighth Amendment violation actionable through a § 1983 claim.  *See Cox v. Nobles*, 15 F.4th 1350, 1361 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1178 (2022).  To be relevant in this suit, the PREA violations must have created a substantial risk of harm or shown deliberate indifference by Ms. Ehlers and Ms. Precythe.

any of the actions about which he complains harmed him to a degree that is constitutionally cognizable. First, BCC staff and other inmates spread rumors and made light of the sexual assault after Mr. Ray reported Ms. Park. For example, Mr. Ray claims that a BCC staff member suggested that he should be tested for STIs, indicated that Mr. Ray fathered a child with Ms. Park, and asked him to show pictures of his son so they could see if he looked similar to Ms. Park's baby. A BCC staff member also joked with other inmates about Mr. Ray's sexual assault. Doc. 101-3, at 97:20– 98:3. Mr. Ray also was harassed by gang members at BCC. The gang threatened Mr. Ray because Ms. Park had engaged in sexual intercourse with (that is, sexually assaulted) Mr. Ray despite Ms. Park's sexual relationship with one of the gang's members. As a result, Mr. Ray often stayed in his cell and housing unit to avoid the gang members. These comments, though inappropriate, do not alone rise to the level of an Eighth Amendment violation. *See Hopson v. Fredericksen*, 961 F.2d 1374, 1378 (8th Cir. 1992) ("Generally, mere verbal threats made by a state-actor do not constitute a § 1983 claim."); *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993) ("Verbal threats and name calling usually are not actionable under § 1983.").[18]

Further, even if disclosing to other inmates that an inmate reported sexual assault creates a substantial risk of serious harm to the inmate-reporter, there is no evidence that Ms. Ehlers or Ms. Precythe knew of that risk. There is no evidence that, at the relevant time, either official knew that Mr. Ray's report had been disclosed or that there was an open and obvious problem of BCC staff discussing reports of sexual assault with inmates. Neither is there any evidence that Mr. Ray

---

[18] *See also Orange v. Ellis*, No. 08–224–JVP–DLD, 2009 WL 454253, at *3 (M .D. La. Feb. 23, 2009) (concluding that calling an inmate a "snitch" and "bitch" was verbal abuse that did not give rise to an Eighth Amendment claim); *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) ("Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment.").

22

reported, or tried reporting, that he was harassed by or afraid of members of a gang because his report of sexual assault had been disclosed.

Next, Mr. Ray claims that BCC impeded his ability to report Ms. Park's sexual assault. But there is no evidence that Mr. Ray's ability to report was impeded by anyone. Once Mr. Ray decided to report Ms. Park, he was able to do so immediately, and Ms. Ehlers promptly requested an investigation, even after Ms. Park had left the prison. Other than prison staff making fun of Mr. Ray for having been sexually assaulted by Ms. Park, Mr. Ray faced no reprisals for his report.

Mr. Ray originally feared reporting Ms. Park because he believed that if he did, he would lose privileges and harm his chances for parole. He testified that he saw other inmates placed in isolation for reporting sexual assault at BCC. However, Mr. Ray provided no specific evidence of this practice. For example, Mr. Ray did not identify affected prisoners, how long they were placed in isolation, or why they were isolated in the first place.

Even if Mr. Ray's ability to report had been impeded, there is no evidence that Mr. Ray suffered a constitutionally serious harm because of it. Mr. Ray was not placed in isolation, did not have his privileges suspended or revoked, and has not suggested that his parole chances were affected. The fact that Mr. Ray himself was not subjected to any such retributive behavior also indicates that, even if such improper conduct had been prevalent at BCC, it was not the practice at the time Mr. Ray reported the assault.

While prisons should, and indeed must, facilitate reporting by prisoners and staff alike of sexual assault, there is no evidence that Mr. Ray suffered any harm because he delayed his report. Without such a showing, Mr. Ray cannot sustain an Eighth Amendment claim. *Berryhill*, 137 F.3d at 1076–77 ("Demonstrating a serious or permanent injury is not required to make out an Eighth Amendment claim, but some actual injury must be shown and the extent of the injury

23

and pain suffered are relevant concerns in determining whether the conduct amounts to cruel and unusual punishment.").

Finally, there is no evidence that Ms. Park and Ms. Ehlers knew that reports of inmate sexual assault were being impeded.

Mr. Ray also cites his struggles to communicate with PREA warden Rick Skaggs. Mr. Ray wrote Mr. Skaggs a letter requesting a copy of the PREA itself as well as BCC's PREA policy. *See generally* Doc. 103-5 (Mr. Ray's complaint regarding inability to communicate with PREA Warden Rick Skaggs, dated November 12, 2020). Mr. Ray found this letter on the desk of another BCC staff member, Doug Gramlich, when Mr. Ray approached Mr. Gramlich to seek the same information that he sought in his letter to Mr. Skaggs. Doc. 103-5. Mr. Ray complained that because this letter ended up with Mr. Gramlich, not Mr. Skaggs, someone intercepted his mail and impeded his ability to report his sexual assault.[19] [20]

However, contrary to Mr. Ray's assertion, this incident did nothing to impede Mr. Ray's ability to report his sexual assault or to subsequently receive treatment. Mr. Gramlich informed Mr. Ray that the information he sought was available in the library, and therefore, there was no harm to Mr. Ray. What's more, the incident happened on November 12, 2020, almost a month

---

[19] There is no evidence in the record explaining how the letter came to be on Mr. Gramlich's desk or what Mr. Gramlich's role at the prison is.

[20] Mr. Ray's testimony also appears to suggest that Mr. Gramlich had access to or blocked his legal communications with his attorneys. *See* Doc. 101-3, at 77:2–16. There is no other evidence in the record about this issue. Mr. Ray's brief does not raise this as a separate legal issue but instead treats it as further evidence that BCC violated Mr. Ray's Eighth Amendment rights in its response to Mr. Ray's sexual assault. Doc. 103, at 10. Whatever legal relevance Mr. Ray's testimony on this point may have, it is not to his Eighth Amendment claim, as it does not make either constitutional harm to Mr. Ray or Ms. Ehlers's or Ms. Precythe's knowledge of it any more or less likely.

24

and a half after Mr. Ray reported Ms. Park and at least a month after Warden Ehlers requested an investigation. Further, Mr. Ray presents no evidence that Ms. Precythe or Ms. Ehlers knew of this incident.[21]

Mr. Ray also complains that he was not transferred after his sexual assault, so he was left for months in the same housing unit in which he was assaulted. This does not amount to a constitutional violation. First, Mr. Ray claims he was denied transfer after reporting his sexual assault in contravention of PREA policy. Doc. 103, at 13. There is no evidence of that. Mr. Ray first testified that he was denied transfer when he requested it because of his medical complaints. *See* Doc. 101-3, at 74:16–76:17; Doc. 103-7, at 2. At that time, he had not yet reported Ms. Park, and accordingly BCC's decision on transfer could not have been influenced by his report of sexual assault. Regardless, the COVID-19 pandemic had put a stop to all prison transfers. Doc. 101-3, at 74:16–24.

It also appears that after Ms. Park's assault, Mr. Ray attempted to transfer again.[22] The pandemic again interfered with Mr. Ray's ability to transfer. Doc. 101-3, at 74:16–24. Mr. Ray believes that if BCC could have transferred him, they would have. Doc. 101-3, at 75:25–76:10. In any event, and perhaps more to the point, Mr. Ray again fails to identify any harm he suffered because of his inability to transfer and to connect that harm to Ms. Ehlers and Ms. Precythe. There

---

[21] While Mr. Ray did submit an Informal Resolution Request ("IRR") related to this incident, there is no evidence showing what happens to IRRs after they are submitted. Thus, on this record, there is no evidence that the IRR provided notice to Ms. Ehlers or Ms. Precythe.

[22] It is unclear whether Mr. Ray sought the transfer after he was assaulted but before he reported or if he discussed the transfer with Ms. Coffelt and Ms. Joyce when he reported the assault. Doc. 101-3, at 74:16–24 (Mr. Ray stating that "after the incident with Ms. Park, I actually put in to go to Farmington laundry to get out of there"). However, whether Mr. Ray sought the transfer before or after reporting the assault is not material to the Court's analysis.

25

is no evidence the transfer process involved either official.[23]  At bottom, this complaint cannot support an Eighth Amendment claim.

### B. Whether Ms. Ehlers and Ms. Precythe Were Deliberately Indifferent to Mr. Ray's Serious Medical Needs

Mr. Ray also raises two challenges related to his medical care at BCC.  To prevail on an Eighth Amendment claim related to prison medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs.  *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997).  This requires Mr. Ray to show that (1) he suffered from an objectively serious medical need, and (2) the Defendants knew of the need yet deliberately disregarded it.  *Id*.

Mr. Ray challenges the ways in which BCC handled his persistent migraines and gastrointestinal issues.  These issues predated Mr. Ray's sexual assault.  Despite several declared medical emergencies, various trips to prison healthcare providers, and visits to outside doctors, Mr. Ray was unable to find relief.  Not only was treatment unsuccessful, but medical staff also made fun of and degraded Mr. Ray for things such as his weight.  *See* Doc. 103-7, at 2–5.[24]

This claim fails for two reasons.

First, Mr. Ray failed to submit "'verifying medical evidence' that the defendants ignored an acute or escalating situation or that delays adversely affected the prognosis given the type of injury in this case," as required to establish the first element of a medical Eighth Amendment claim.  *Dulany v. Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997).  The only evidence related to Mr. Ray's medical care is his handwritten diary documenting his interactions with BCC and

---

[23] Ms. Park was also no longer employed at BCC when Mr. Ray requested transfer.

[24] As the Court explained above, this harassment, while unacceptable, cannot sustain an Eighth Amendment challenge.

outside medical professionals. Mr. Ray had an affirmative obligation to produce some medical evidence establishing that BCC in effect ignored his severe or worsening gastrointestinal issues or that BCC's delay adversely affected his prognosis. That, he has not done.

Second, and more fundamentally, even if Mr. Ray *had* produced medical evidence establishing deficient care, he has produced no evidence from which a reasonable jury could conclude that Warden Ehlers or Director Precythe knew that Mr. Ray was receiving deficient healthcare. The only evidence of Mr. Ray's continuing struggle with his gastrointestinal issues was his Informal Resolution Request ("IRR"), received by BCC on July 30, 2020. Doc. 103-7. It summarizes Mr. Ray's medical care throughout the month of July 2020. There is no evidence that Ms. Ehlers or Ms. Precythe saw the IRR, or even that they had access to it as a matter of course. While someone at BCC did sign off on the IRR, as there is a staff member's signature on it, Mr. Ray introduced no evidence that would permit a jury to tie the IRR to Ms. Ehlers or Ms. Precythe.[25] It is undisputed that neither Ms. Precythe nor Ms. Ehlers was personally involved in the medical treatment of any inmate at BCC, including Mr. Ray, and that they rely on medical professionals to provide medical services to inmates. Nor is there any evidence from which a reasonable jury could conclude that either official knew about Mr. Ray's contention that BCC medical staff regularly provided inadequate healthcare to inmates. Finally, Mr. Ray has introduced no evidence that there was a failure at a policy level that led to Mr. Ray's inadequate healthcare. For example, there is no suggestion that medical decision-making was affected by a BCC or Missouri Department of

---

[25] Indeed, there is no evidence at all discussing what happened after Mr. Ray submitted his IRR. It is clear from the document itself that BCC staff discussed it with him, and that the complaint was not resolved through that discussion. The form indicates that Mr. Ray had the right to file a formal grievance. There is no evidence that he did.

Corrections policy on the treatment of migraines or gastrointestinal issues or a practice of ignoring inmates' medical complaints.

Next, Mr. Ray targets BCC's decision not to provide a "full panel test for sexually transmitted diseases" after he reported Ms. Park's sexual assault. BCC and Department of Corrections policy requires that inmates receive testing after sexual assault. BCC medical staff would test Mr. Ray only for chlamydia and gonorrhea. Doc. 103-6, at 2. There is no evidence explaining why BCC staff made that decision. The Court shall assume for the purpose of this motion that comprehensive STI testing following a sexual assault in prison—especially a sexual assault that involves penetrative sex, rather than, for example, over-the-clothes touching—represents a serious medical need. But here again, Mr. Ray fails to establish that Warden Ehlers and Director Precythe were deliberately indifferent to that serious medical need. Neither official was personally involved in Mr. Ray's medical treatment following his assault, nor would they have been in a position to know about the treatment as a matter of course. Prison and PREA policies both mandated testing, but this does not suggest that inmates typically are not tested for HIV or syphilis. At bottom, there is no evidence on which a reasonable jury could rely to find that Warden Ehlers and Director Precythe were aware of, let alone that they disregarded, Mr. Ray's serious medical need.

IV.     Conclusion

Troubling as much of the BCC conduct following his reporting of sexual assault might be, at bottom, Mr. Ray has produced no evidence from which a reasonable jury could conclude that any of the acts, policies, and procedures about which he complains constitute an Eighth Amendment violation attributable to either Ms. Ehlers or Ms. Precythe. At the summary judgment stage, Mr. Ray cannot simply rely on the allegations in his Amended Complaint or this Court's

28

Order denying the Defendants' Motion to Dismiss.  He must produce evidence to support his claims.  Because he has not, the Court **GRANTS** summary judgment in favor of Ms. Ehlers and Ms. Precythe.  Mr. Ray's claims against Ms. Park remain pending.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: 3/14/2023
Jefferson City, Missouri